CITY OF CARROLLTON BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, Voter Education Project City of Carrollton, Marvin Walker, Robert Springer, James Wyatt and Jeff Long, Plaintiffs-Appellants,

v.

Tracey STALLINGS, Individually and in his official capacity as Mayor of the City of Carrollton, et al., Defendants,

Horrie Duncan, Individually and in his capacity as Carroll County Commissioner, et al., Defendants-Appellees.

Nos. 86–8405, 86–8661.

United States Court of Appeals, Eleventh Circuit.

Oct. 19, 1987.

Hugh Jeffery Lanier, Asst. Atty. Gen., Atlanta, Ga., J. Eugene Beckham, Jr., Johnson, Beckham & Price, Robert F. Dangle, Carrollton, Ga., for amicus curiae.

Wayne B. Kendall, Kendall, Kendall & Hurst, Angelia R. Souder, Atlanta, Ga., for plaintiffs-appellants.

J. Eugene Beckham, Jr., Johnson, Beckham & Price, Carrollton, Ga., for Horrie Duncan.

Robert H. Sullivan, Tisinger, Tisinger, Vance & Greer, P.C., Carrollton, Ga., for Brown, Ault, Martin, Gambel & Greer.

Before HATCHETT and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This appeal involves a challenge to the single county commissioner form of government in Carroll County, Georgia, under the Voting Rights Act of 1965, as amended, and under the Constitution of the United States. The plaintiffs are appealing the district court's judgment for the defendants, based on its finding that the creation and continued use of the single member Carroll County Commission does not violate Section 2 of the Voting Rights Act of 1965, as amended, nor does it deprive black persons in Carroll County of their § 1983 claims by violating their rights guaranteed by the First, Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution.

## I. STATEMENT OF THE CASE

The plaintiffs in this action are City of Carrollton Branch of the Voters Education Project (VEP), the City of Carrollton Branch of the National Association for the Advancement of Colored People (N.A.A.C. P.), and various individuals who are black citizens, residents and registered voters of Carroll County, Georgia.

The plaintiffs originally filed this action against the City of Carrollton, members of the Carrollton City Council, individually and in their official capacity, the Carroll County Commission and members of the Carroll County Election Board, seeking declaratory and injunctive relief under the First, Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution of the United States, and under Sections 2 and 5 of the Voting Rights Act of 1965, Title 42 U.S.C. § 1973, et seq. and § 1983.

The Section 5 claims were heard by a three-judge court convened under authority of 28 U.S.C. § 2284, which denied a temporary injunction by order entered November 20, 1984. By order entered January 17, 1985, defendants Horrie Duncan, individu-

1549

ally and in his official capacity as Carroll County Commissioner, Patti Brown, A.G. Ault, Carol Martin, James Gamble and Tommy Greer, individually and in their official capacities as members of the Carroll County Election Board, were severed from defendants Mayor and Council of the City of Carrollton. On October 16, 1985, the parties settled all claims against the city and a notice of dismissal was filed as to defendants Mayor and Council of the City of Carrollton. Thereafter, the case proceeded only as to the county defendants. Judgment was entered in their favor after trial by the court. Costs were assessed against the plaintiffs.[1]

A second issue relating to the defendants' award of costs in this lawsuit, is consolidated with this appeal.

## II. FACTS

The plaintiffs alleged and sought to prove that the one person form of commission government in Carroll County resulted in the exclusion or dilution of black voting strength and lessened the opportunity of black persons in Carroll County to participate in the political process and to elect or have appointed to public office representatives of their choice. The facts, principally in the form of statistics and opinion evidence, will be discussed *infra*. The district court concluded that the plaintiffs failed to establish that there was a lack of ability of blacks to participate in the political process in Carroll County [the statutory claims] and failed to establish, by a preponderance of the evidence, that racial discrimination was a motivating factor for the present form of county government [the constitutional claims].

## III. DISCUSSION

After the district court entered its judgment and opinion on April 29, 1986, the United States Supreme Court rendered its decision in *Thornburg v. Gingles*, the first Supreme Court interpretation of 1982 amendments to Section 2 of the Voting Rights Act of 1965.[2] The *Gingles* decision is important in many respects. We, therefore, measure the correctness of the trial court's decision in light of its holding. We note that the election procedure in *Gingles* required at-large voting for persons for a single district [multi-member district]. We consider the single-member county commission here to be in all essential respects comparable with the multi-member district discussed by the court in *Gingles*. It was the *at-large* election procedure in *Gingles* that commanded the court's attention.

First and foremost *Gingles* recognizes that both the language of the 1982 amendments to Section 2 of the Voting Rights Act and its legislative history establishes that "a violation could be proven by showing discriminatory effect alone," rather than discriminatory intent.[3] The 1982

---

1. Most notable and significant with respect to the issues of costs the plaintiffs contend that their settlement with the city defendants resulted in the creation of four single member districts and one at-large district. The plaintiffs contend that this settlement therefore conferred a direct benefit on the plaintiffs' class and, as a consequence, costs should not be awarded against them.

2. *Thornburg v. Gingles*, —— U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

3. 106 S.Ct. at 2759 (1986).
   Section 2, as amended, reads as follows:
   (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention

of the guarantees set forth in section 4(f)(2), as provided in subsection (b).
(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
42 U.S.C. § 1973.

amendments to the Act were a direct response by Congress to the Supreme Court's earlier plurality opinion in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which had established discriminatory intent as the standard for proving unconstitutional vote dilution under both the Fourteenth and Fifteenth Amendments.[4] Supporters of the Voting Rights Act had successfully urged Congress to amend the Act to provide statutory protection for minority vote dilution through a results test, which had been applied by the Supreme Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and by other federal courts before *Bolden.*

Second, *Gingles* not only followed the results test mandated by Congress, but also established a new three-part test for analyzing minority vote dilution claims under Section 2 of the Voting Rights Act.[5] Both parties in this appeal and the district court's opinion followed the totality of circumstances approach in applying the results tests as outlined by the Senate Judiciary Report accompanying the 1982 amendments to the Voting Rights Act.[6]

Although reliance on the Senate factors is still relevant in evaluating a minority vote dilution claim, the Supreme Court has said that "unless there is a *conjunction* of the following circumstances, the use of multi-member districts generally will not impede the ability of minority voters to elect representatives of their choice. Stated succinctly, a bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Id.* at 2766.

The court then went on to state a new three-part test focusing on the existence of a politically cohesive geographically insular minority group and voting along racial lines, as necessary preconditions for multimember districts to operate to impair minority voter's ability to elect representatives of their choice. The court enunciated the following test.

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Id.*

The court's new three-part test establishes that racial bloc voting is the hallmark of a vote dilution claim. *Id.* at 2784–86; *see also Collins v. City of Norfolk,* 816 F.2d 932, 936–37 (4th Cir.1987), on remand from *Collins v. City of Norfolk,* —— U.S. ——, 106 S.Ct. 3326, 92 L.Ed.2d 733 (1986) (vacating *Collins v. City of Norfolk,* 768 F.2d 572 (4th Cir.1985). The Court remanded the case for consideration in light of *Thornburg v. Gingles; see generally, Comment,* Thornburg v. Gingles: The Supreme Court's New Test for Analyzing Minority Vote Dilution, *36 CATH U.L.Rev. 537, 552 (1987).*

Although the district court examined each of the factors listed by the Senate Judiciary Committee under the totality of

---

**4.** 106 S.Ct. at 2759.

**5.** 106 S.Ct. at 2766–67.

**6.** The Senate Report relies on the totality of circumstances approach as previously followed by the Supreme Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332 and by the Fifth Circuit in *Zimmer v. McKeithen,* 485 F.2d 1297 (1973), *aff'd sub nom., East Carroll Parish School Board v. Marshall,* 425 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), prior to the Supreme Court's opinion in *Mobile v. Bolden.* Under that approach plaintiffs could prevail by showing

that under the totality of circumstances, a challenged election law or procedure had the effect of denying a protected minority an equal chance to participate in the electoral process. Under the results test, plaintiffs are not required to demonstrate that the challenged electoral law or structure was designed or maintained for a discriminatory purpose. The Senate Report goes on to list the typical factors of the totality of circumstances approach to be considered in applying the results test. *See infra* at III (hereinafter the "Senate factors").

circumstances approach in deciding in favor of the county defendants, the district court's opinion placed too much importance on those factors on which the Supreme Court has since given less importance.

Since the district court strictly followed the totality of circumstances approach and Senate factors without the benefit of the Supreme Court's analysis of those factors in *Gingles*, we must note where the district court committed errors in trying this case below. Before summarizing those errors, we first note the background of this lawsuit, and the relative positions of each party and the district court's treatment of those issues.

### 1. *Background and History*

Carroll County is located in the west central part of Georgia between the Atlanta area and Alabama. It consists of 495 square miles, and has a population according to the 1980 census, of 56,346 people. Of that figure, 9,679, or 17% are black, and 46,441, or 82% are white. There are 39,517 persons 18 years old or older in the county, and 6,051 or 15.3% are black. Black voters constitute a minority in the county. For the most part, the black population is concentrated in neighborhoods on the west side of the City of Carrollton.

Carroll County is governed by a single commissioner who is voted upon by voters of the entire county and serves a term of four years. 1983 Georgia Laws P. 4656.[7] A majority vote is required for the nomination and election of the county commissioner. Ga.Code § 21-2-501. This single commission form of county government in Carroll County was established by Georgia law, 1951, p. 3310 and has been in existence since January 1, 1953. It was continued by Ga.L. 1983, p. 4656. However, prior to 1951, a three-member board of commissioners governed Carroll County between the years 1945–1952.

Throughout the history of Carroll County, various legislative acts were enacted altering the structure of its government. In 1885, Ga. Act. No. 173, created a five-member commissioner government in Carroll County. In 1894, Act. No. 10 repealed the Act of September 1885 creating a five-member commission and conferred on the ordinary of the county the powers of commissioner. In 1903, the legislature passed Act No. 466, which created a five-member commission. In 1908, Act. No. 511 was enacted creating the office of commissioner of roads and revenues for Carroll County, a single-member commission. Thereafter, the County had a single-member commission government until 1945, when it was changed again to a three-member commission. That was the system in effect when the legislature changed it to a single commissioner in 1951.

In 1947, a bill was introduced in the legislature by Representative Willis Smith of Carroll County to re-establish a one-person commission of Carroll County. This bill was subject to a referendum of voters of the county. The referendum apparently failed, because Representatives Smith and Duncan in 1951 introduced a bill, H.B. 534, having the same effect without a referendum. This bill passed and became effective on January 1, 1953. This bill was supported by the unanimous vote of the two Carroll County representatives and the senator for the district of which Carroll County was a part.

Evidence introduced at the trial quotes Representative Smith as saying in a speech favoring the passage of the white primary bill, which was pending before the 1947 legislature at the term during which Smith introduced the 1947 bill: "Georgia is in trouble with the Negroes unless this bill is passed. This is a white man's country and we must keep it that way."

No black person has run successfully for the office of commissioner throughout the history of Carroll County. Although the

---

7. The Carroll County Commissioner is the entire governing body for the county. The commissioner is vested with the powers, among other things: to direct, control and convey the county property; to abolish wards, to establish election

precincts and militia districts according to law, to select and appoint all minor offices of the county, whose election or appointment is not otherwise fixed by law. 1983 Georgia laws, 4656 at 4660.

district court found there has been a history of discrimination in the State of Georgia which has had an adverse impact upon blacks in Carroll County, the court also found that there was *no evidence* that the change in the form of government from a three-man board of commissioners to a single-member, was *enacted* or is being maintained with an intention to discriminate against minorities or of diluting minority voting rights. The court incorrectly noted that the 1951 Act establishing the sole commissioner was introduced by Senator William Trotter of Troup County, Georgia. The court held that no opposition to the change was expressed by any organization or individual.

## 2. *The Constitutional Challenge*

■ As noted above, the trial court stated that there was *no* evidence that the change in the form of government was *enacted* with an intention to discriminate against minorities. The court apparently based this conclusion on the testimony of witness William P. Trotter, who had been the state senator from the senatorial district which was comprised of Carroll, Troup, and Haralson counties. Trotter was a resident of LaGrange which is in Troup County. The court misconstrued Trotter's testimony, which was: "I okayed the passage of it [the one-person commission bill] through the senate after it had passed the House." The trial court stated: "The bill was introduced by Senator Trotter of Troup County, Georgia." The Senate Journal shows that the bill was introduced in the House of Representatives by Representatives Smith and Duncan and it had passed the House before being voted on by the Senate, Journal of the Senate, Monday, Feb. 12, p. 471 (1951).

The significance of this fact is that Trotter's testimony at the trial that he had no racial purpose in mind was unimportant, because he was not the person who introduced or sponsored the bill. Instead, it was introduced and sponsored by the two representatives from Carroll County, one of whom was Willis Smith. This is of special significance because, as appears from the 1947 House Journal, Smith had introduced the same bill in 1947 at the session of the legislature during which he made the speech quoted above favoring the white primary bill.[8]

We conclude that the speech made by the sponsor of the 1947 single-commissioner act for Carroll County, which act he later sponsored in 1951, was evidence of an intent to discriminate against black voters in any voting legislation before the General Assembly during that session, and that a finder of fact might well infer that such intent continued until 1951 when the bill was re-introduced under the same sponsorship. *See* in this connection, Parker, *The Results Test of the Voting Rights Act*, 69 Va.L.Rev. 715, 741 (In the absence of a "smoking gun" victims of discriminating voting laws must resort to circumstantial evidence, inferences, suspicions and likelihood of discriminatory intent.)

---

**8.** The white primary bill was a bill which was introduced in the Georgia General Assembly sponsored by Governor Talmadge for the ostensible purpose of avoiding the problems created for those attempting to maintain white supremacy through the white Democratic party by the Supreme Court decision in 1944 in *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987. In that case, the Supreme Court had held in effect, that the fact that the state legislature by statute controlled many of the activities of the Democratic party in Texas, had the effect of converting into state action the activities of the Democratic party in excluding blacks from voting. The white primary bill in Georgia undertook to repeal all of the prior acts of the legislature which controlled the holding of elections or the holding of conventions by political parties. In doing this, it repealed all laws against ballot box stuffing, voting more than once, and delivery by printers of ballots to those other than qualified election officials. It also repealed laws protecting ballots after elections and protecting registration lists. Under the bill, registration lists would be left entirely in the hands of the county Democratic committees. Thus, the election laws in Georgia would permit the white Democratic party, which was the only party holding elections in Georgia at the time, to operate entirely without state supervision. The white primary law passed the legislature in 1947, but was later vetoed by Governor Thompson when he assumed office under a decision by the Georgia Supreme Court, which held him to be the winner of the election of that year.

We conclude, therefore, that there was evidence that the trial court should have considered in deciding whether there was an unconstitutional motivation in the mind of the introducer of the bill.[9]

### 3. The Statutory Challenge

■ As both *Gingles* and the 1982 amendment to the Voting Rights Act make clear, proof that a contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters, is not required under Section 2 of the Voting Rights Act. Notwithstanding a constitutional challenge to the single-member commission in Carroll County, subsection 2(b) of the Voting Rights Act establishes that § 2 has been violated

> where the "totality of the circumstances" reveal that the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973, as amended, 96 Stat. 134 Sub. Sec. 2(b); *Gingles* 106 S.Ct. at 2763. Thus, the plaintiffs may prevail by showing that as a result of the challenged practices or structure, they have less opportunity than other voters in Carroll County to participate in the political process and to elect candidates of their choice.

Congress has determined that whether a particular electoral structure or practice impacts on minority electoral opportunities, is determined on an objective basis based on a number of factors. The Senate Report which accompanied the 1982 amendments to the Voting Rights Act listed seven "typical factors that were probative of a § 2 violation." These factors were originally derived from the Supreme Court's opinion in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). These factors, which the district court also relied on in trying the case below and are central to this appeal are:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals; and

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

Two additional factors listed in the Senate Report as having probative value are:

1. Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

2. Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite

---

**9.** It is particularly significant to note that in considering the motivation of the sponsor of a bill in the Georgia legislature, we take judicial notice of the existence of the custom at that time that no local legislation would be enacted by the state legislature without the approval of all of the members of the local delegation. The court considered the testimony of Senator Trotter on motivation.

to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29, *reprinted in* 1982 U.S.Code Cong. & Ad. News 177, 206–07.

In listing these factors in its opinion, the district court correctly noted that:

> Both the Senate Report and the *Zimmer* case explicitly state that there is no requirement that the plaintiffs prove that all or even a majority of these factors are present, Rather, ... "courts are to consider the existence of these factors ... in the aggregate, or as the language of Section 2 states, based upon the totality of circumstances."

Citing *Collins v. City of Norfolk, Va.*, 605 F.Supp. 377, 381 (E.D.Va.1984), *aff'd*, 768 F.2d 572 (4th Cir.1985).[10]

The district court further stated that the "most important of these factors is the presence of racially polarized voting, (Senate Factor No. 2)," and that this circuit has stated that the "existence of racially polarized voting is the keystone of a vote dilution case." Citing *United States v. Marengo County Com'n.*, 731 F.2d 1546, 1566 (11th Cir.1984), *cert. denied*, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984).

Nonetheless, the district court concluded that:

> After considering all the evidence in the case, the plaintiffs have not sufficiently demonstrated the existence of racially polarized voting. Even if the court was to assume the existence of racial bloc voting, after examining the other senate factors, plaintiffs still do not prevail on their voting rights claim. There

is no credible evidence that senate factors Nos. 3, 4, 6 and additional factor No. 2 impact upon his case.

The district court then went on to list its findings with respect to the other senate factors.

As will be shown herein, the district court misconstrued the theory of racial polarized voting as it relates to a claim of vote dilution and applied the incorrect legal standard in determining there was no Voting Rights Act violation.[11]

First, we note that the clearly erroneous test of Rule 52(a) is the appropriate standard for appellate review of ultimate findings of vote dilution. In *Gingles*, the Supreme Court reaffirmed its view that the clearly erroneous test of Rule 52(a) is the appropriate standard for appellate review of vote dilution. However, the clearly erroneous standard does not prevent the court from correcting findings of fact based on misconceptions of the law. The Court stated:

> The fact that amended § 2 and its legislative history provide legal standards which a court must apply to the facts in order to determine whether § 2 has been violated does not alter the standard of review. As we explained in *Bose*, Rule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.

*Id.* 106 S.Ct. at 2782.

The essence of a Section 2 claim as characterized by the court in *Gingles*, is that

---

**10.** The case which the district court cites, *Collins v. City of Norfolk, Va.*, 605 F.Supp. 377, 381 (E.D.Va.1984), *aff'd*, 768 F.2d 572 (4th Cir.1985), was reversed and remanded by the Supreme Court in light of *Thornhill v. Gingles. See, e.g., Collins v. City of Norfolk,* — U.S. ——, 106 S.Ct. 3326, 92 L.Ed.2d 733 (1986).

**11.** In *Gingles*, Justice Brennan wrote a five part opinion, four parts of which were joined by a majority of the court. The majority opinion established that racial bloc voting was a key element in proving vote dilution and also established a new three part test for analyzing vote dilution claims. The majority opinion also provided a definition of racially polarized voting and outlined a standard for legally significant

racial bloc voting. Part III.C of Justice Brennan's opinion joined only by Justices Marshall, Blackmun and Stevens, delineated the standard of statistical evidence necessary to determine racially polarized voting. Thus, there was only a plurality of the court on the evidentiary standard to prove racial bloc voting. There were also three concurrences; Justice White filed a concurring opinion; Justice O'Connor filed an opinion concurring in the judgment, in which Chief Justice Burger, Justice Powell and Justice Rehnquist joined and Justice Stevens wrote an opinion concurring in part and dissenting in part, which was joined by Justice Marshall and Justice Blackmun.

certain electoral characteristics interact with social and historical conditions to create an inequality in the minority and majority voters' ability to elect their preferred representatives. *Id.* at 2764–65. The theoretical basis of this impairment exists, according to the Court,

> where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters. The crucial factor in showing that the majority will defeat the choices of the minority voting is racial polarized voting.

*Id.*

Although adherence to the Senate factors may still be relevant to a claim of vote dilution, the court in *Gingles* carefully developed the proposition that to prove a Section 2 violation "a bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically, insular minority group." *Id.* at 2766.

In footnote 15 of the Court's opinion, the Court underscored the significance of racial bloc voting and minority electoral success and enunciated what it believed effectuated the true intent of Congress in listing the Senate factors accompanying the 1982 amendment. The Court stated:

> Under a "functional view of the political process mandated by § 2, S.Rep. 30, n. 120, the most important Senate Report factors bearing on § 2 challenges to multimember districts are 'extent to which minority group members have been elected to public office in the jurisdiction' and the 'extent to which voting in the election of the state or political subdivision is racially polarized.' If present, the other factors, such as the lingering effects of past discrimination, the use of appeals to racial bias in election campaign, and the use of electoral devices which enhance the dilutive effects of multimember districts when substantial white bloc voting exists—for example antiballot voting laws and majority vote requirements, are supportive of, but not essential to a minority voters claim." In recognizing that

some Senate Report factors are more important to multimember dilution claims than others, the Court effectuates the intent of Congress. It is obvious that unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability to "elect".... *Id.* (emphasis added.) The Court then goes on further to say: "By recognizing the primacy of the history and extent of minority electoral success and of racial bloc voting, the Court simply requires that § 2 plaintiffs prove their claim before they can be afforded relief." *Id.* at n. 15.

It is therefore clear at the outset, that although the district court followed the totality of circumstances approach as then applied in lower courts in *Zimmer* and *Collins v. City of Norfolk*, the court, nonetheless, applied the incorrect standard in adjudging the legal significance of racial bloc voting and its relation to the other Senate factors. Under *Gingles*, the district court was incorrect when it held that even assuming racial polarization was found, the plaintiffs could not prevail because the other Senate factors were not proven. *Gingles* makes it clear that the other Senate factors are supportive of, but not essential to, a minority voter's claim. The *Gingles* decision is essentially a "gloss" on the Senate factors and a limitation on the interpretation of those factors in proving a vote dilution claim. *See, e.g., Collins v. City of Norfolk,* 816 F.2d 932 (4th Cir.1987).

On remand, the district court must make the proper inquiry under the factors which the Supreme Court has said are most important: "(1) the extent to which minority group members have been elected to public office in the jurisdiction; and (2) the extent to which voting in the election of the state or political subdivision is racially polarized."

### (A) *The District Court's Finding as to Racially Polarized Voting*

Having established that the court erred in applying the totality of circumstances approach, as since interpreted by the Su-

preme Court in *Gingles,* we next address the district court's specific findings as to racially polarized voting and the other Senate factors bearing on vote dilution.

In its order ruling in favor of the county defendants, the district court stated: "After considering all the facts presented in this case, the court concludes that the plaintiffs have not sufficiently demonstrated the existence of racially polarized voting." The district court based its ruling on the failure of the plaintiffs' expert witness, Dr. Michael Binford, to examine certain county and municipal elections in his statistical analysis of vote returns in determining the existence of racially polarized voting.

At trial, the plaintiffs attempted to prove the existence of racially polarized voting through the statistical analysis of vote returns conducted by their expert witness, Dr. Binford. Dr. Binford examined evidence of racially polarized voting based on statistical analysis of voting returns, registration returns and the examination of three election races in which black candidates ran for election for county-wide offices in Carroll County. These elections were Jeff Long's race for county commissioner in 1976, and Narva Farris's races for sheriff of Carroll County in 1980 and 1984. In addition to the three county-wide elections, Dr. Binford also analyzed the election results from each precinct in the 1984 presidential elections where the Reverend Jesse Jackson ran as a presidential candidate in the Democratic party primary.

Dr. Binford's conclusions, based on a correlation method to measure polarization in voting, found there was a strong correlation between the registration characteristics of the precincts and the percentage of votes that each candidate received in the elections which he examined. This analysis, in statistical terms, is called an R2 coefficient, which correlates the percentage of a particular racial group registered in a given precinct, with the percentage of the precinct votes for a minority candidate. *See, e.g., N.A.A.C.P. v. Gadsden County School Board,* 691 F.2d 978, 983 (11th Cir. 1984). Dr. Binford found there were

strong correlations; .75, .78 and .86 in each of the county races respectively, and .91 in the precincts where the Reverend Jesse Jackson ran as a candidate. Based on these findings, Dr. Binford testified there was a substantial degree of racially polarized voting in Carroll County.

However, the district court cast doubt on the validity of Dr. Binford's analysis. The court stated that:

Dr. Binford did not analyze Robert Benham's race for the Georgia Court of Appeals in 1984, nor did he analyze any of the city of Carrollton elections or other community elections in Carroll County in which a black candidate ran successfully.

Dr. Binford did not analyze the elections when Mr. Farris ran on a county ticket. Failure to analyze all of the available data, casts doubt on the ultimate conclusions of the expert.

The district court further noted that there was no testimony concerning the issue of "white backlash" or whether whites have ever attempted to limit the field of candidates or hinder any black candidacy. The court concluded that the evidence did not sufficiently indicate that race was an overriding or primary consideration in the election of a candidate.

The appellees also attacked the validity of Dr. Binford's analysis, on the basis that he used 1979 registration figures by race to compare 1976 election returns and that he failed to take into account the results of Judge Robert Benham's election in 1984 and other municipal and county elections where blacks ran on a ticket.

The district court's finding as to the nonexistence of racial bloc voting, is crucial to the appellants' Section 2 claim. As *Gingles* makes clear, "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Gingles* 106 S.Ct. at 2766.

The district court's treatment of racial polarized voting must also be analyzed in light of the standard for determining legally significant racial bloc voting as set out by the Court in *Gingles.*

In *Gingles*, the Court stated that while the extent of bloc voting necessary to demonstrate that minority voting is impaired would vary from district to district, there were some general principles relative to bloc voting which the court then proceeded to pronounce. According to the Court, the purpose of inquiring into the existence of racially polarized voting is two-fold:

> to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc *usually* to defeat the minority's preferred candidates. See supra at ——. Thus, the question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices.

*Id.* at 2769 (emphasis added).

Next, the Court gave an indication as to how those voting practices could constitute legally significant bloc voting. Minority bloc voting, under Section 2, can be established by showing that a significant number of minority group members usually vote for the same candidates; and, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes, rises to the level of legally significant white bloc voting. *Id.* at 2770. Moreover, the Court said that the amount of bloc voting that will minimize or cancel out black voting strength will vary from district to district, according to a number of factors, such as the nature of the alleged dilutive electoral mechanism, other dilutive devices such as majority vote requirements, designated posts, size of the district, percentage of registered voters and the number of candidates in the field. *Id.*

Additionally, the Court noted that racial bloc voting is more probative of a claim that a district experiences legally signifi-

cant polarized voting, if a pattern of bloc voting is shown over a period of time, rather than the results of a single election. In this regard, the Court stated:

> "[T]he fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting. Furthermore, the success of a minority candidate in a particular election does not necessarily prove the district did not experience polarized voting in that election; special circumstances, such as the absence of an apparent incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest."

*Id.* Finally, the Court noted that because the degree of racial bloc voting that is cognizable as an element of a § 2 voting dilution claim would vary from case to case, the Court declined to announce any single doctrinal test to determine the degree of legally significant racial bloc voting.

However, what is at least clear from the Court's opinion, is that racial bloc voting does not depend on the success or defeat of a particular candidate. Under Section 2, it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate that is important. *Id.* at 2776.[12] The Court stated:

> In sum, we would hold that the legal concept of racially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates. Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may

**12.** Only a plurality of the court agreed with Justice Brennan's analysis here in Part III C of his opinion; it was joined only by Justices Marshall, Blackmun, and Stevens. It held that causation was irrelevant to a Section 2 inquiry and that the race of the voter not the candidate, is the primary determination of voter behavior. Justice Brennan wrote that both the language of § 2 and a functional understanding of the phe-

nomenon of vote dilution mandate the conclusion that the race of the candidate per se is irrelevant to racial bloc voting analysis. *Id.* at 2773–75. The plurality also rejected the suggestion that racially polarized voting refers only to white bloc voting which is caused by white voters' racial hostility toward black candidates. *Id.* at 2777.

not rebut that case with evidence of causation or intent.

*Id.* at 2779.

■ With this legal framework for determining the existence of racially polarized voting and its interplay with a politically cohesive, geographically insular minority group, the district court's finding regarding the lack of racially polarized voting must be re-examined. At the outset, it is clear that contrary to the district court's conclusion, the plaintiffs established their case of racially polarized voting, by a preponderance of the evidence, through the clearly acceptable means of a bivariate regression analysis and the testimony of lay witnesses. Although no one statistical theory is appropriate for all vote dilution cases, the Eleventh Circuit has approved the form of statistical analysis used by the plaintiffs in this case. *See, e.g., N.A.A.C.P. v. Gadsden County School Board*, 691 F.2d 978, 983 (11th Cir.1984). *Cf., Lee County Branch of the N.A.A.C.P. v. City of Opelika*, 748 F.2d 1473, 1482 (11th Cir. 1984) (Court cautioned against placing too much reliance on R2 coefficients in ruling on the issue or racially polarizing voting); *McCord v. City of Fort Lauderdale*, 787 F.2d 1528 (11th Cir.1986).

Moreover, the form of regression analysis used by Dr. Binford was also approved by the plurality in *Gingles*.[13] Here, the district court erred when it ruled that the plaintiffs' statistical proof was lacking because the plaintiffs' expert witness did not examine election returns for municipal elections in Carrollton and the Carroll County voting returns of the statewide re-election of Judge Benham of the Georgia Court of Appeals.

The reliance on other elections here is clearly misplaced. Since the city of Carrollton as the city defendant was severed from this lawsuit as a result of a settlement of the parties, it can hardly be said

that the plaintiffs' evidence failed because they did not analyze Carrollton city elections. The voting rights statute is violated if a protected class has "less opportunity than other members of ·the electorate to participate in the political process and to elect representatives of their choice." The inquiry here is the Carroll County singular commission form of government, not the City of Carrollton nor any other municipality for that matter. The plaintiffs are alleging that the one person form of county government in Carroll County, and by its very nature, elected on an at-large basis, dilutes their voting strength and their ability to elect a political candidate of their choice. Thus, it is the ability of minority voters to elect candidates of their choice to political office on a county wide basis, which is important here and of vital concern under the Voting Rights Act. The plaintiffs' evidence, in this regard, showing a racial correlation of voting in three races in which blacks ran for office county wide, has been unrefuted. The defendants did not offer any rebuttal evidence of any kind. Moreover, as a plurality of justices of the Supreme Court have held, it is the race of the voter, not of the candidate, which is of concern in racial polarization claims.

Additionally, the district court concluded that the statistical evidence of vote dilution was insufficient because Judge Benham's race was not examined. First, we must point out, as the Supreme Court said in *Gingles*, "special circumstances, such as the absence of an opponent, incumbency, … may explain minority success in a polarized contest." *Gingles* 106 S.Ct. at 2770. Judge Benham, an incumbent black Judge on the Court of Appeals, ran for re-election to the court throughout the State of Georgia, as did other Court of Appeals Judges. He received 45% of the vote in Carroll County, not a majority, as he did in the state at-large. Moreover, at

---

13. There, the Court also adopted the lower court's definition of racial polarization to describe the correlation shown by the regression analysis. (Racial polarization exists where there is a "consistent relationship between the race of the voter and the way in which the voter votes.") *Gingles* 106 S.Ct. at 2768, n. 21. Commentators

suggest that the plurality has repudiated the earlier line of reasoning first adopted by the Fifth Circuit in *Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir.), *reh. denied*, 730 F.2d 233 (1984), and later expanded in *Opelika*, which rejected the use of bivariate analysis.

trial, the plaintiffs' counsel asked Dr. Binford, their expert witness, whether the lack of knowledge that Judge Benham was a black man may have affected the election results in the race. Dr. Binford testified, however, that he had no way of measuring that.

There are many factors which could explain minority success in a particular election, as the Supreme Court has said, and certainly the lack of knowledge that an incumbent judge is black, is one of those factors. But, as a plurality of the Court has said, "both the language of § 2 and a functional understanding of the phenomenon of vote dilution, mandate the conclusion that the race of the candidate per se is irrelevant to racial bloc voting analysis." *Id.* at 2775.

The district court further found that the plaintiffs had failed to examine the race when Mr. Farris, a black, ran on a county ticket. However, an examination of the record shows that the plaintiffs did examine the races when Mr. Farris ran for Sheriff of Carroll County in 1980 and 1984, where he received 14.7% and 15.4% of the votes cast respectively. The only apparent reference to the county races which the district court spoke of must be the contests for sheriff in 1972 and 1976, when Mr. Farris was listed as a *deputy* on an election ticket in which white candidates ran for sheriff. Mr. Farris did not run for election as a deputy sheriff; he was appointed by virtue of his relation to the ticket.[14] The notion that the plaintiffs' statistical evidence of racially polarized voting must fail because of the failure to analyze the election contests when Mr. Farris assisted a white candidate for sheriff get elected, misconstrues the theory of vote dilution. It is the access of minority voters to the political process, not the majority's access to the black vote, which is the chief concern of Section 2 of the Voting Rights Act.

Thus, we hold that there is substantial evidence in the record to indicate that Carroll County experiences racially polarized

voting in county-wide elections. There was also non-expert testimony that racial polarization of the vote existed in Carroll County. On remand, the district court need not re-examine evidence as to the third prong of the Supreme Court's test for minority vote dilution in *Gingles* —whether the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the black candidate. The district court's finding that a preponderance of evidence did not show racially polarized voting in county-wide elections in Carroll County is clearly erroneous for the reasons as set forth in this opinion. Moreover, the district court's definitional use of the concept of white backlash as indicative of racially polarized voting is also misplaced in light of the Court's opinion in *Gingles*.

(B) *Minority Electoral Success*

We now turn to the next Senate factor of major concern to the Court in *Gingles;* the extent to which minority group members have been elected to public office in the jurisdiction.

The extent of minority electoral success in the jurisdiction, is the second most important factor identified by the Court in *Gingles* to § 2 challenges to multi-member districts. *Gingles* at 2766 n. 15. In *Gingles,* the Court reversed part of the district panel decision that had found a § 2 violation in North Carolina House District 23 (Durham). There, the court held that the fact that blacks in House District 23, who constituted 36 percent of the population and had elected one black to a three member House delegation in six elections since 1973, thereby enjoying proportional representation, mandated judgment for the defendants.

A similar finding, however, cannot be made for Carroll County. First, no black candidate has ever been elected commissioner of Carroll County under its single member commission system, nor did a black candidate serve on the Carroll Coun-

---

14. In 1972, Mr. Farris was appointed as a deputy as a result of the election of W.J. Robinson, whom Farris had supported. In 1976, Farris supported D.A. Jackson for sheriff, who lost. Farris was therefore not reappointed as deputy sheriff.

ty Commission during its years as a three member commission, between the years 1945 and 1951. In other words, no black has ever been elected Commissioner of Carroll County. However, the district court noted that black persons have been appointed to various county boards and commissions in Carroll County, apparently as evidence of minority electoral success in the jurisdiction. The district court stated that blacks were appointed to the "Election Board, Water Authority Board, Department of Family and Children Services, the Public Health Board, the Hospital Board Authority and the West Georgia Regional Library." Most of these appointments were made, according to the court, by Tracy Teal, the County Commissioner.

However, despite these various appointments, no black has ever been *elected* to *any* county office in Carroll County. There is simply no minority electoral success on the county level to measure at all. While appointments to boards and commissions may be evidence of the willingness of some whites to allow some black participation in the political process, it does not demonstrate the ability of blacks to get elected to political office in Carroll County.

Second, the extent to which minority candidates have been elected to office *in the jurisdiction,* obviously must be measured by elections in the political jurisdiction in question, in this case Carroll County. The district court pointed as evidence of minority success, to the election of a black to the city council in Carrollton, and the city councils of Villa Rica and Temple, the election of a black as mayor of the city of Whitesburg and the election of a black to the Carrollton School Board.

However, the plaintiffs contend that the election of a black to the Carrollton City Council, was a direct result of the initiation of the lawsuit against the Carrollton City Council and its then existing at-large election system. The appellants also contend that few black appointments to boards and commissions existed before the filing of this lawsuit. They contend that a black was not elected to the Carrollton City Council until the council changed from a

multi-member at-large system to a four single member district system. Prior to this change, they argue, blacks had run unsuccessfully for the city council.

In *Gingles,* the Supreme Court noted that the Senate report to the 1982 amendments expressly states that, "the election of a few minority candidates does not necessarily foreclose the possibility of dilution of black vote" and that "the possibility exists that the majority citizens might evade § 2 by manipulating the election of a safe minority candidate". *Gingles* at 2779. The Court further noted that the Senate report "requires an independent consideration of the record" and a "searching practical evaluation of the past and present reality." *Id.* According to the Court, the language of Section 2 and its legislative history plainly demonstrate that proof that some minority candidates have been elected does not preclude a § 2 claim. *Id.* at 2780.

In the instant case, proof that the election of a minority candidate to political office occurred after initiation of a lawsuit could be a factor mitigating against a finding of increased minority electoral success. As the former fifth circuit stated in *Zimmer v. McKeithen* 485 F.2d 1297, 1307 (5th Cir.1973), "such success, might be attributable to political support motivated by different considerations—namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds."

In any case, there is no "sustained minority electoral success" approximating the level of representation which the Supreme Court spoke of in *Gingles,* as evidence of the ability of black voters to elect representatives of their choice in Carroll County. In this case, there has been hardly any minority representation at all. The district court's reliance on municipal elections in Carroll County as proof of minority electoral success of a county electoral scheme is obviously misplaced. The political jurisdiction in question here is the county, not the cities of Villa Rica, Whitesburg, or Carrollton.

The record plainly demonstrates the clear lack of minority electoral success in Carroll County.

(C) *Other Senate Factors*

Applying the totality of circumstance approach, the district court made specific findings of fact as to other Senate factors bearing on vote dilution. Although these factors are supportive of, but not essential to a minority voter claim, contrary to the district court's findings, proof of these factors is not required to show a vote dilution claim. We, nonetheless, briefly describe the district court's findings as to the other Senate factors.

The district court ruled that the parties agreed that there was no slating process in Carroll County (Senate factor no. 4) and further ruled that the evidence does not support the conclusion that the structure of Carroll County's election system adversely affects minority interests (factor no. 3) or that county campaigns have been characterized by racial appeals (factor no. 6). The court concluded that the policy underlying Carroll County's single-member at-large Commission is not tenuous. (Additional factor no. 2). The court noted that although responsiveness is of limited importance under Section 2, it nonetheless ruled that the evidence did not establish there was any racial effect involved in the alleged unresponsiveness (additional factor no. 1). The court noted that a history of official discrimination did exist in Carroll County but that the plaintiffs failed to establish there was a lack of ability of blacks to participate in the political process (factor no. 1).

Although there still remain economic disparities between blacks and whites (factor no. 5), the court ruled that the defendants had sufficiently carried their burden in disproving any causal connection between economic disparities and reduced political participation by minorities. While stating that there did not appear to be any lack of educational opportunities, the court noted that there were still social and economic disparities between blacks and whites in Carroll County, although these disparities

had decreased. The court ruled that any continuing disparities did not depress the level of black participation in Carroll County politics. The court further ruled that black citizens of Carroll County currently register, vote, and run for office without any impediments. While noting that there was room for improvement, the court stated that "the county had made acceptable efforts in the present as well as the past to increase minority registration and that past discriminatory practices do not presently hinder blacks from registering and voting in Carroll County elections". The court found that the voter registration facilities were dispersed throughout the county and were available to all citizens equally without regard to race. The district court concluded, based on a number of circumstances, that the black population in Carroll County has an equal opportunity to participate in the political process.

We, however, take exception to the district court's analysis of certain Senate factors. First, the district court concluded that the defendants had carried their burden in disproving any causal nexus between social and economic disparities and the lack of access to the political process. The court said that there did not appear to be a lack of educational opportunities. However, the proper concern here is what effect discrimination in education has had on the level of black participation in the political process. Undoubtedly, a low level of black registration may well be indicative of a depressed level of participation in the political process, caused by a number of factors, including discrimination in education. Moreover, the district court recognized that the lack of black teachers in the Carroll County school system was a factor bearing on unresponsiveness, and that this had caused the court deep concern, but, the court nonetheless ruled that the plaintiffs did not prove what steps defendants should have undertaken to increase the number of qualified black teachers. We do not understand that the plaintiffs must carry as part of their burden, establishing what measures the county should have taken to correct alleged unresponsiveness by school administrators.

As to the district court's finding regarding black voter registration, the appellants contend that new registration sites were established in the black community only after the lawsuit was filed, despite difficulties in black registration which had long existed. The appellants contend that the location of voter registration at the County Court House, intimidated blacks who desired to register to vote.

The record reflects, according to the 1980 census, that blacks constituted only 9% of the registered voters of the county, while they were 15.3% of the voting age population. In 1984, the percentages of black registered voters increased to 10.8%. Yet, the evidence remains that blacks are still under registered in Carroll County which may impact on their ability to participate in the political process. Low black registration is highly probative, but not dispositive of lack of black electoral participation. However, we cannot conclude that the district disregarded this fact in concluding there was no lack of access to the political process.

Finally, a finding by the district court that the structure of Carroll County's election system did not adversely affect minorities, must be re-examined in light of the Court's opinion in *Gingles*. The district court found that this 495 square mile, majority vote, at-large district did not adversely affect the ability of minorities to participate in the political process. The Supreme Court has found that electoral mechanisms such as unusually large geographical boundaries, at-large elections, and majority vote requirements often operate in a discriminatory fashion to deny the minority's access to the political system. *See, e.g., White v. Regester,* 412 U.S. 755, 766, 93 S.Ct. 2332, 2339–40, 37 L.Ed.2d 314 (1973) (majority vote requirements); *Rogers v. Lodge* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) (unusually large geographic district, and a majority vote requirement that was found to submerge the will of the minority and to deny the minority's access to the system).

Although we have difficulty with the district court's findings, we cannot say that they are clearly erroneous as a matter of law.

However, we point out, that *Gingles* commands the trial court's attention to the Senate factors which are deemed most important to a vote election claim; the extent of minority electoral success and polarized voting. The other Senate factors are a "gloss" on a vote dilution claim, but not its essence. *See Collins v. City of Norfolk, supra.*

(D) *Application of the Gingles Test*

After reviewing the propriety of the district court's ruling in relation to the Senate factors, we must now discuss that ruling in light of the new three part test established by the Supreme Court in *Gingles* for proof of vote dilution cases.

The district court's ruling on racial polarized voting, which we have already discussed, addresses the third prong of the *Gingles* test—the degree of racially polarized voting. However, the first and second parts of the test, which are equally important, must be addressed by the parties and the court. *Gingles* requires, as an initial threshold showing: first, that the minority group must be able to demonstrate that the multi-member district is sufficiently large and the minority is sufficiently compact to be able to constitute a majority in a single member district; and second, the minority group must be able to show that it is politically cohesive. *Gingles* 106 S.Ct. at 2766. These two factors, in addition to racial polarized voting, are necessary preconditions for multi-member districts to operate to impair minority voting strength.

In a footnote, the court stressed the relative importance of showing, as a threshold matter, that the minority group is sufficiently large and geographically compact to constitute a majority in a single member district:

Unless, the minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.... Thus, if the minority group is spread evenly through a multimember district,

or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single member district, these minority members cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral scheme.

*Id.* at 2766 n. 17. In this sense, the court is stressing the importance of the concentration of minority voters as a group, and their political cohesiveness, whose electoral choices at the polls are defeated by the at-large voting scheme.

■ In the trial below, the district court disallowed the plaintiffs' proffers of evidence relating to the geographic concentration of voters by race in proposed three member and five member forms of commission government in Carroll County. The district court sustained the defendants objections to plaintiff's exhibits 84, 85, 86, 87 on relevancy grounds. The demographic evidence proffered by plaintiffs is highly relevant to a showing under *Gingles:* whether black voters in Carroll County are sufficiently numerous and compact to constitute a majority in a single member district, if single member districts were created out of the one county district. In this case, it is the at-large nature of the districting scheme which is alleged to operate in the same fashion, as multi-member districts in diluting black voting strength. Clearly, the district court erred in disallowing such evidence under the Supreme Court's approach in *Gingles.* On remand, such evidence should be admitted on the question of the geographic concentration of the voters by race.

Second, the plaintiffs must establish in addition to geographic compactness that the minority group is politically cohesive. If the minority group is not politically cohesive, then it cannot be said that the present scheme thwarts minority voting interests.

Although such political cohesiveness may indeed exist in Carroll County, there has been no specific finding as now required by *Gingles.* On remand, the parties should

have an opportunity to present evidence of the political cohesiveness of black voters in Carroll County or the lack thereof.[15]

## IV. CONCLUSION

In sum, we REVERSE and REMAND the judgment of the district court for consideration in light of the Supreme Court's opinion in *Gingles* and our interpretation of that decision as it relates to the case at hand.

We also REVERSE the district court's finding that there was no evidence of a constitutional violation in the original adoption of the County Commissioner system of government. The evidence in the record and our judicial notice of the sponsor of the 1951 bill, raises an inference of an unconstitutional motive in the mind of the introducer of the bill.

The judgment for costs is VACATED and REMANDED for further consideration by the trial court.

---

**15.** The proof of racial polarization may, of course, be found sufficient by this Court to make the necessary finding of cohesiveness.